UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GREGORY M. QUILLIN and wife,          )
HELEN QUILLIN,                        )
                                      )
              Plaintiffs,             )
                                      )
v.                                    )          No. 3:03-CV-151
                                      )          (VARLAN/SHIRLEY)
EASTON SPORTS, INC. and               )
CHUMBOLLY, INC. d/b/a THE BIKE ZOO,   )
                                      )
              Defendants.             )

**MEMORANDUM & ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), the Rules of this

Court, and by Order [Docs. 116, 184, 194, 200] of the Honorable Thomas A. Varlan, United States

District Judge, for disposition of several pretrial motions [Docs. 111, 113, 117, 148, 190, 199].


I.      **BACKGROUND**

This lawsuit arises from a bicycle accident which occurred on April 29, 2002 while

the plaintiff Gregory M. Quillin was riding on a mountain trail in Anderson County, Tennessee. The

plaintiff claims that the handlebar suddenly snapped, causing him to fall and to incur serious injuries.

[Doc. 1]. The subject handlebar was a carbon fiber handlebar manufactured by the defendant Easton

Sports, Inc. ("Easton"). The handlebar was connected to the bicycle by a handlebar stem

manufactured by L.H. Thomson Company.[1]  The defendant Chumbolly, Inc. d/b/a The Bike Zoo

("Bike Zoo") installed the Thomson stem on the plaintiff's bicycle.


## II.    APPLICABLE LAW: ADMISSIBILITY OF EXPERT TESTIMONY

Each party has filed numerous motions challenging the qualifications and/or opinions

of various expert witnesses under Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell

Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Rule 702 of the Federal Rules of Evidence

governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

The trial judge must act as a gatekeeper, admitting only that expert testimony that is relevant and

reliable.  Daubert, 509 U.S. at 589.  With regard to scientific knowledge, the trial court must initially

determine whether the reasoning or methodology used is scientifically valid and is properly applied

to the facts at issue in the trial.  Id.  To aid the trial court in this gatekeeping role, the Supreme Court

has listed several key considerations: (1) whether the scientific knowledge can or has been tested;

(2) whether the given theory or technique has been published or been the subject of peer review; (3)

whether a known error rate exists; and (4) whether the theory enjoys general acceptance in the

particular field.  Id. at 592-94.  The Court's focus "must be solely on principles and methodology,

---

[1]L.H. Thomson Company was originally a defendant in this matter but was granted
summary judgment on June 17, 2005. [Doc. 80].

not on the conclusions that they generate." Id. at 595. "[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1318 (9th Cir. 1995).

Although Daubert centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999); Berry v. City of Detroit, 25 F.3d 1342, 1350 (6th Cir. 1994). The trial court's objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152. The trial judge enjoys broad discretion in determining whether the factors listed in Daubert reasonably measure reliability in a given case. Id. at 153. With this framework in mind, the Court will now address each of the parties' motions.

## III. DR. JOHN FELLERS

Easton moves to exclude the testimony of John E. Fellers, who has been designated as an expert by both the plaintiff and Bike Zoo. [Doc. 111]. For grounds, Easton argues: (1) that the Rule 26(a)(2) disclosure of Dr. Fellers is inadequate; (2) that Dr. Fellers' opinions regarding Easton's manufacturing process are merely hypothetical speculation; and (3) that Dr. Fellers' opinions are not supported by any scientific testing or reliable methodology. [Doc. 111].

Both the plaintiff and Bike Zoo oppose Easton's motion, arguing that the expert disclosure was adequate and that Dr. Fellers' testimony satisfies the requirements of Rule 702 of the Federal Rules of Evidence. [Docs. 119, 121].

Dr. Fellers is a retired professor of material science and engineering at the University of Tennessee. He is presently chief manager for Knoxville Applied Polymers, LLC in Loudon County, Tennessee. He has a B.S. Degree in chemistry and a Ph.D. in polymer science. According to his Curriculum Vitae, Dr. Fellers has published several scientific articles on the subject of failure causes in carbon fiber and carbon fiber composites.

### A. Dr. Fellers' Rule 26(a)(2) Disclosure

Bike Zoo served its Rule 26(a)(2) Disclosure of Dr. Fellers on September 26, 2005. [Doc. 129 Ex. A]. The Disclosure contained a letter dated September 5, 2005 from Dr. Fellers to attorney Dan Stanley, with attachments; an affidavit dated December 23, 2004 ("Fellers First Aff."), with attachments; and a second affidavit dated August 12, 2005 ("Fellers Second Aff."), with attachments. Additionally, Bike Zoo provided a summary of Dr. Fellers' deposition and trial testimony in other case in the last four years, his curriculum vitae, which includes a list of his publications, and a disclosure of the compensation he received for his review and testimony in this case.

Easton argues that this disclosure contains no statement of any scientific bases for Dr. Fellers' opinions and also fails to disclose much of the data and information upon which Dr. Fellers relied in forming his opinions. Easton argues that Bike Zoo's non-compliance with Rule 26(a)(2) is sufficient to merit the exclusion of Dr. Fellers' testimony.

4

Rule 26(a)(2) of the Federal Rules of Civil Procedure requires the disclosure of the identity of a witness who has been retained or specially employed to provide expert testimony. Fed. R. Civ. P. 26(a)(2)(B). The disclosure

> shall . . . be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Id.

Easton argues that Bike Zoo's disclosure regarding Dr. Fellers fails to satisfy Rule 26(a)(2)'s requirement that the expert submit a "written report." While Bike Zoo's disclosure admittedly does not follow the letter of Rule 26(a)(2), the Court finds that it at least complies with the spirit of the Rule. In his letter to attorney Stanley, Dr. Fellers states that this correspondence, along with the two affidavits, was a "complete view of [his] opinion." A review of these documents shows that they contain descriptions of Dr. Fellers' measurements and visual observations of the handlebar, as well as copies of photographs and documents he reviewed in forming his opinions. Additionally, Bike Zoo's expert disclosure sets forth Dr. Fellers' qualifications and publications, the compensation he received in this case, and a list of prior cases in which he testified in the last four years. Thus, the Court finds that Bike Zoo's disclosure of Dr. Fellers' testimony substantially complies with Rule 26(a)(2), despite Bike Zoo's failure to file a formal "written report."

Easton further argues that the disclosure was inadequate because Dr. Fellers relied on certain documents and notes that were not disclosed as required by Rule 26(a)(2). Dr. Fellers

5

testified in his deposition that prior to filing his first affidavit, he visited the L.H. Thomson Company

("Thomson") with attorney John Neal, spoke with Thomson employees and representatives, and took

notes of these conversations. Additionally, he was provided materials and documents by Thomson.

Dr. Fellers testified in his deposition that he intended to rely upon this information in forming his

opinions in this case. [Fellers Dep. at 13-15, 25-26, 37].

Rule 37(c)(1) provides, in pertinent part, that "[a] party that without substantial

justification fails to disclose information required by Rule 26(a) . . . is not, *unless such failure is*

*harmless*, permitted to use as evidence at a trial, at a hearing, or on a motion, any witness or

information not so disclosed." Fed. R. Civ. P. 37(c)(1) (emphasis added). The Court finds that Bike

Zoo's failure to disclose the notes and other material and information Dr. Fellers received during

his visit to the Thomson facility to be harmless in this case because such information was discovered

and produced during Dr. Fellers' November 3, 2005 deposition. [Fellers Dep. at 13-15, 25-26, 37].

Accordingly, the Court cannot say that Easton has suffered any undue prejudice as a result of Bike

Zoo's failure to timely disclose this information.

## B. <u>Reliability and Relevance of Dr. Fellers' Opinions</u>

The substance of Dr. Fellers' opinions can basically be summarized as follows:

1. The handlebar failed as a direct result of substandard manufacture.
Specifically, the handlebar was "out-of-round," which caused uneven
stress distribution. [Fellers Second Aff. at ¶ 4].

2. The failure of the handlebar was not caused or facilitated by a
loose mechanical connection between the stem and the handlebar.
[<u>Id.</u> at ¶ 5]. The handlebar and stem were not inadequately
assembled, nor was there any inadequate torquing of the stem bolts.
[<u>Id.</u> at ¶ 6].

3. Dr. Stevenson's opinions are flawed in several ways. Specifically,
Dr. Fellers opines that:

6

(i) Dr. Stevenson is erroneous in stating that the fracture started at the bottom of the handlebar;

(ii) Dr. Stevenson's testing is "not statistically significant";

(iii) Dr. Stevenson ignores the significance of the "out-of-roundness" of the handlebar;

(iv) Dr. Stevenson misinterprets the meaning of the partial concentric markings on the handlebar where it meets the stem; and

(v) Dr. Stevenson failed to take into account any fatigue damage to the handlebar from the 47 times the plaintiff rode the bicycle prior to the accident using this handlebar with a different stem. [Id. at ¶ 11].

## 1.    Manufacturing Defect

Easton argues that Dr. Fellers' opinions are not relevant to the issue of whether there was a manufacturing or design defect in the subject handlebar; that his opinions are not based on sufficient facts or data; and that his opinions are not the product of reliable principles and methods. Specifically, Easton argues that the opinions stated by Dr. Fellers regarding defects in Easton's manufacturing process are nothing more than hypothetical speculation, and that Dr. Fellers has not done any testing to support his conclusions. Easton further argues that Dr. Fellers at no point even attempts to relate any of his comments regarding defects in the manufacturing process to any actual defects in the handlebar at issue in this case. [Doc. 111].

### a.    Out-of-Roundness

Dr. Fellers opines that the handlebar was "out-of-round," which in turn caused uneven stress distribution. He opines that the handlebar has variances up to nine thousandths of an inch. [Fellers First Aff. at ¶ 5]. In Dr. Fellers' opinion, application of a finely machined stem such as the Thomson stem that was used in this case will create "uneven loading . . . wherever the high places of the diameter meet the Thomson stem." Accordingly, he concludes that "Easton's failure to produce a handlebar which is absolutely consistent in diameter make its handlebar more susceptible to failure." [Id. at ¶ 6].

Dr. Fellers testified that he based his conclusion that the handlebar was out of round on the measurements taken of the diameter of the handlebar near the left side of the stem, as well as Easton's manufacturing protocol. [Fellers Testimony, Feb. 23, 2006 at 156]. Based upon his visual examination of the handlebar, Dr. Fellers also noted that the fracture pathway was consistent with the notion that the highest place on the handlebar (i.e., the maximum "out-of-roundness") was the location of the greatest contact stress. With respect to his opinion that the out-of-roundness made the handlebar more susceptible to failure, Dr. Fellers admitted that he had not done any testing to support that opinion, but he stated that his "opinion does not need testing. That's a matter of engineering principle." [Id. at 158].

At the Daubert hearing, Dr. Fellers admitted that he did not know what the stress concentration factor was at the highest place on the handlebar, and that he had not done any testing to determine what that stress concentration was or the impact of that stress contribution factor on the handlebar itself. [Id. at 159]. Dr. Fellers further admitted that he had not done any testing to determine the effect of a handlebar being out of round by 0.005 inches versus being out of round by

8

0.010 inches.  [Id. at 173-74].  He did, however, perform a calculation, which he explained as follows:

> A.     Well, we know that carbon fiber in tension has a nominal breaking strain close to one percent.  Could be slightly higher than that, but it's close to one percent.   And when one has these differences, and the differences are uneven, and this is designed to go in a one-inch hole, 1.000, three zeros, with a plus or minus one thousandths of an inch tolerance, once you start to get away from that tolerance and especially if the dimensions change, you're now placing a load on the area where it's gripped.  And then there is an area outside that that's not gripped.
>
> And as you're doing that you're placing a strain on this fiber.  If there's enough load on that to deflect and to stretch that carbon fiber, you're taking it closer and closer to its failure point.
>
> So the difference between five thousandths and then thousandths of an inch then become[s] significant, because the five thousandths of an inch extra tolerance would allow the possibility of going halfway to the breaking strain.

[Id. at 173-74].  Dr. Fellers noted that the one percent breaking strain is "commonly known in the literature." [Id. at 187].

Easton argues that Dr. Fellers did not do any testing to support or verify his conclusions concerning the handlebar's out-of-roundness, and therefore, his conclusions are unreliable.  The Court does not agree.  The Court finds that Dr. Fellers has stated a reliable basis for his opinion that the handlebar was out of round and that this condition contributed to the failure of the handlebar.  The mere fact that Dr. Fellers did not perform any testing does not render the methodology upon which he based his opinions unreliable *per se*.  As the Sixth Court has noted, "there is no single criterion for determining whether a specific scientific methodology is reliable." Pride v. BIC Corp., 218 F.3d 566, 577 (6th Cir. 2000).  The Daubert Court identified several factors

9

that may be considered when evaluating the validity of scientific testimony, including whether the expert's hypothesis can or has been tested. See Daubert, 509 U.S. at 593-94. The Court finds that Dr. Fellers' opinions regarding the out-of-roundness of the handlebar are capable of being tested; the fact that Dr. Fellers himself has not done so may be excellent fodder for cross-examination, but it does not render his opinions on this issue inadmissible.

### b. Other Manufacturing Defects

Dr. Fellers' September 5, 2005 correspondence to attorney Stanley includes copies of several Easton documents that Dr. Fellers states "provide[] insight into the problems and techniques used to fabricate, inspect, and repair defects in [Easton's] product." Dr. Fellers includes several comments on these documents in the correspondence. In these comments, Fellers identifies several other potential defects in the manufacturing process of Easton handlebars and makes the following observations:

> 1. The presence of microscopic surface or interior voids or flaws "*can* lead to a reduction in the fracture strength because the applied stress *may be* magnified or concentrated at the crack tip";
>
> 2. Misalignment of the sheets of carbon fiber "*could* lead to the generation of flaws and premature failure";
>
> 3. The use of acetone to clean the fabricated part "*could* lead to sorption of the chemical";
>
> 4. The expansion of the epoxy network due to swelling and contraction due to expansion and/or evaporation of the acetone "*could* lead to crazing, environmental stress cracking and/or cavitation" which in turn "*could* lead to premature failure of the handlebar";
>
> 5. Mixing and agitation of the paint leads to the formation of bubbles which, if not removed, "would increase the porosity and lead to reduction in the fracture strength";

10

6. Placement of the handlebar in an upright position after a final coating of protective coating "*may* lead to uneven thickness."

[Fellers Sep. 5, 2005 Correspondence] (emphasis added).

Also, at the <u>Daubert</u> hearing, Dr. Fellers stated that, based upon his review of various Easton documents, he was of the opinion that there are pinhole defects in the handlebar. He testified that these defects are not observable because the holes are filled during the manufacturing process. He stressed that the filling of these holes is cosmetic and does not restore the strength of the carbon fiber. He further stated that evidence of the defects would not likely be visible in a microscopic analysis because the defects are often obliterated by the breaking up of the carbon fiber during a fracture. [<u>Id.</u> at 174]. Dr. Fellers admitted that he had not done any testing to determine the impact of a pinhole defect in a carbon fiber handlebar. [<u>Id.</u>].

The Court finds that Dr. Fellers does not have a reliable basis for testifying that any of these possible manufacturing defects were present in the subject handlebar or contributed to the failure of the handlebar in this case. Dr. Fellers' comments in his correspondence to attorney Stanley do not state any expert opinion with any certainty. Rather, Dr. Fellers speculates regarding possible sources of failure of Easton handlebars as a result of the particular manufacturing processes utilized. Moreover, Dr. Fellers expresses no opinion that any of the possible sources of failure identified in these comments caused or contributed to the failure in this case or that any of the problems he identified were even present in the subject handlebar. Thus, the Court concludes that the opinions expressed in these comments would not "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid. 702. Accordingly, Dr. Fellers' opinions with respect to these manufacturing defects shall be excluded.

## 2.	Loose Mechanical Connection

Next, Dr. Fellers opines that the failure of the handlebar "was not caused or facilitated by a loose mechanical connection between the stem and handlebar." [Fellers Second Aff. at ¶ 5]. In support of his opinion that the handlebar's failure was not caused by a loose mechanical connection, Dr. Fellers notes that his "evaluation of the handlebar and stem did not reveal any inadequate assembly of the connection between the handlebar and stem nor was there any inadequate torquing of the stem bolts." [Id. at ¶ 6]. Specifically, Dr. Fellers notes in his first affidavit, that "the bolts were properly torqued with relatively even pressure throughout the joint." [Fellers First Aff. at ¶ 3].

At the Daubert hearing, Dr. Fellers defined "properly torqued" as meaning that "the handlebar was gripped with sufficient force to be suitable for riding." [Fellers Testimony, Feb. 23, 2006 at 223]. He explained the basis for his statement that the stem bolts were properly torqued at the time of the accident as follows:

> Q.	Would you tell me the basis for your statement that the bolts were properly torqued?
>
> A.	Well, we had the torque measurements. They were the – of course, the break-away torque. They are lower, of course, than the 48-inch-pounds, but break-away or unloading torque is always lower than torque checked in the other direction. So there's relatively even pressure because the two torque settings that we did find are not that far apart.
>
> Q.	Well, let me ask this question again. You said that the bolts were properly torqued. My question is, what information do you have, if any, that they were torqued at the 48-inch-pounds?
>
> A.	All I have is the same as everybody else has, that is, Mr. Clark's testimony that he followed the installation procedures at the time that he installed the handlebar.

[Id. at 150]. Dr. Fellers also based his opinion that the handlebar was not loose in the stem on the fact that the bicycle "went through a severe wreck, and there's no indication that the . . . wreck produced any change in orientation" of the handlebar. Further, he noted that the stem markings were not full circles, and that if the handlebar had rotated, "that would have tended to complete those." Further, he noted that had the handlebar been loose, these lines would have been smeared. [Id. at 209-10].

Bike Zoo advances a curious position. On the one hand, it argues that reliance on the torque measurements by Easton's expert Dr. Stevenson is misplaced because these measurements are not reliable indicia of the torque applied at the time of installation. On the other hand, Bike Zoo's own expert cites these torque measurements in support of his opinion that the stem bolts were adequately torqued at the time of installation (but have since loosened over time). The Court is highly skeptical of Dr. Fellers' reliance on the torque measurements in reaching this opinion. Nevertheless, the Court finds that Dr. Fellers' examination of the handlebar-stem assembly, including his observations of the orientation of the handlebar logo and his interpretation of the partial markings on the handlebar, are sufficient bases for his opinion that there was not a "loose connection" between the stem and handlebar in this case. Accordingly, the Court will permit Dr. Fellers to offer an opinion on this issue.

### 3.      Criticism of Dr. Stevenson's Opinions

Dr. Fellers states that Dr. Stevenson's opinions are flawed in several ways. First, Dr. Fellers states that Dr. Stevenson has no basis to opine to that the torque on the handlebar stem bolts was too low. In support of this opinion, Dr. Fellers states the "torque measures that we took were not too low." [Fellers Second Aff. at ¶ 7]. He further notes that the handlebar did not move during

the accident, as photographs taken in Dr. Fellers' laboratory show that the Easton logo was in its installed position after the accident. [Id. at ¶ 7, 8].

Dr. Fellers also takes issue with Dr. Stevenson reliance on the torque values that Dr. Fellers measured two years after the accident. Dr. Fellers states that these torque measurements would not be the same torque as was applied by the Bike Zoo during installation:

> First of all, any flow of the polyester coating on the surface of the handlebar as well as any permanent compression in the stem section would lower the torque on the stem bolts over time. Secondly, since the thermal expansion coefficients of the aluminum stem/the Allen head steel bolts used to affix the stem and the composite handlebar do not match[,] all temperature changes that have occurred to the stem connection since its installation have acted to loosen this connection. Third, it is the nature of the forces acting on the stem bolts to cause the torque to lessen over time. The lower torque measurements found two years after installation does not mean that there was a loose mechanical connection between the stem and the handlebar as opined by Dr. Stevenson. Examination of the connections between the Thompson [sic] stem and the Easton handlebar reflects that the bolts were adequately torqued, but the irregular diameter of the Easton handlebar gave an uneven stress distribution.

[Id. at ¶ 7]. In the Daubert hearing, Dr. Fellers opined that the "loosening" torque measurements taken by his assistant over two years after the accident had to have been lower than the "tightening" torque at installation due to "the passage of time, the undocumented history of what's actually happened to this bicycle and the fact that there is crush damage to the handlebar in the vicinity where it's clamped." He reasoned that these conditions, in addition to the delamination that occurred, would have lowered the binding forces against the bolts, thus causing the torque to decrease. [Id. at 210-11].

Next, Dr. Fellers criticizes Dr. Stevenson's reliance on certain markings on the handlebar as evidence that the stem bolts were undertorqued. Dr. Fellers states that the

14

photomicrographs that were taken in his laboratory "clearly indicate that these markings are the result of the machining markings on the inside of the aluminum stem which were imprinted on the surface of the handlebar where the handlebar and stem are clamped together" and that the markings made only partial rings due to "the uneven dimensions of the diameter in this section." [Fellers Second Aff. at ¶ 8].

Dr. Fellers also opines that Dr. Stevenson's opinions are flawed because they are based on only a marginal difference in property value for the failure condition, which Dr. Fellers states is not statistically significant. Specifically, Dr. Fellers notes that Dr. Stevenson's report states that the exemplar tested to simulate the "loose" connection broke at 534 lbf, but that the exemplar set at 48 in lbf tested at 624 lbf, a difference of only 16%. Citing a property value chart in the Modern Plastic Encyclopedia, Dr. Fellers notes that a 20% property spread for the same polymer tested under the same conditions is very frequently seen. [Id. at ¶ 9].

Dr. Fellers further opines that Dr. Stevenson ignores the significance of the "out-of-roundness" of the handlebar where it meets the stem, which tends to create point loading on the high portions of the handlebar. Dr. Fellers opines that the handlebar's "out-of-roundness" further tends to nullify any significance of the two exemplar tests which Dr. Stevenson conducted. [Id. at ¶ 11(iii)].

Dr. Fellers next opines that Dr. Stevenson erroneously describes how the fracture occurred in this case. Dr. Fellers states that the fracture occurred started at the top of the handlebar and propagated to the bottom, not from the bottom up as testified to by Dr. Stevenson. As grounds for this opinion, Dr. Fellers states that because the epoxy resin and the carbon filled composite are both stronger in compression than in tension, "[t]he mechanics of this situation is such that, with the

15

rider's weight on top of the handlebar, the top of the handlebar is in tension, while the position at the radial bottom is in compression." Dr. Fellers cites the Modern Plastics Encyclopedia's statement of epoxy resin and carbon filled composite tensile and compressive strength in support of this assertion. [Id. at ¶ 10]. In the Daubert hearing, Dr. Fellers stated that he also based his conclusion on his review of literature on flexual testing of tubular composites, including three-point and four-point bending tests, as well as the documented tensile strength of the materials involved. [Fellers Testimony, Feb. 23, 2006 at 175-76].

Finally, Dr. Fellers criticizes Dr. Stevenson's failure to "take into account any fatigue damage to the handlebar from the 47 times Mr. Quillin rode the bicycle using this handlebar with a different stem, before the date of the accident in this case." [Fellers Second Aff. at ¶ 11(v)]. In the Daubert hearing, Dr. Fellers explained as follows:

> Q.      Did you find any significance with regard to potential fatigue damage due to the times that Mr. Quillin rode the bicycle before getting that Thomson stem?
>
> A.      I think they're significant, and I submitted the one document from Engineering Composites, which has so called s/n curve. We know that he, Mr. Quillin, rode this bicycle a number of times, he rode it under conditions where it's a dirt bike and that there were significant loads. In fact, one of his experiences produced failure.
>
> So these are significant loads, and if he rode it 47 times it's safe to say that he had more than 100 loading cycles on this material. And when you get past 100 loading cycles, we start to see fatigue damage.

[Fellers Testimony, Feb. 23, 2006 at 212-13].

Upon careful review of Dr. Fellers' affidavits and his testimony in the Daubert hearing, the Court concludes that Dr. Fellers has stated an adequate and reliable basis for the majority of his critiques of Dr. Stevenson's analysis. The Court finds, however, that Dr. Fellers'

16

opinion regarding fatigue damage is not based upon sufficient facts or data. It appears to the Court that there is no scientific basis for Dr. Fellers' opinion that fatigue damage would be evident after 47 rides. Dr. Fellers did not observe any fatigue damage in the handlebar, and he did no testing to verify that the previous 47 rides would have such an effect. Finally, Dr. Fellers offers no scientific support that fatigue damage was present or contributed to the failure of the handlebar in any way. The Court finds Dr. Fellers' opinion in this regard to be speculative and without foundation.

### C. Conclusion

The parties apparently do not dispute that Dr. Fellers is qualified, based upon his experience and training, to testify regarding the failure of the subject carbon fiber composite handlebar. Dr. Fellers has stated a reliable basis for his opinion that the handlebar was out of round and that this condition contributed to the failure of the handlebar. He has also stated a reliable basis for his opinion that there was not a loose connection between the handlebar and the stem at the time of the accident. Dr. Fellers states several criticisms of Dr. Stevenson's opinions, which the Court finds to be admissible. Dr. Fellers, however, shall not be permitted to offer any expert opinions regarding fatigue damage in the handlebar or regarding any manufacturing defects other than the alleged out-of-roundness of the Easton handlebar.

For the foregoing reasons, Easton's Motion to Exclude Testimony of Proffered Expert Witness John E. Fellers [Doc. 111] is **GRANTED IN PART** and **DENIED IN PART**.

## IV.    ANAND KASBEKAR

In response [Doc. 108] to Bike Zoo's motion for summary judgment, the plaintiff submitted the affidavit of Anand David Kasbekar, Ph.D.  Dr. Kasbekar had previously been identified by name in response to written discovery in December, 2004, but no expert report was submitted at that time.  On October 3, 2005, approximately seven days after the expiration of the deadline for disclosure of expert witnesses, the plaintiff served on the defendants Easton and Bike Zoo a Designation of Expert Witnesses, listing Dr. Kasbekar as a witness to "testify as to the causation of the failure of the Easton CT2 handlebar at issue in this case."  The Designation further states that a "supplemental report is being prepared as of the date of this disclosure" and would be produced.  Despite the reference to a "supplemental report," no original report had ever been served on the defendants.  Indeed, no Rule 26(a)(2) "report" was ever forthcoming.  Instead, on October 12, 2005, the plaintiff filed the subject affidavit of Dr. Kasbekar in response to Bike Zoo's motion for summary judgment.  This affidavit was the first disclosure of Dr. Kasbekar's opinions to the defendants.

Both defendants moved to exclude Dr. Kasbekar's opinions.  In an Order entered December 28, 2005, the Court found that Dr. Kasbekar's opinions were timely disclosed as to Bike Zoo and that Bike Zoo's disclosure of his testimony was adequate to satisfy Rule 26(a)(2) of the Federal Rules of Civil Procedure.  The Court, however, limited the scope of Dr. Kasbekar's testimony to the subject matter stated in his affidavit.  The Court granted Easton's motion to exclude Dr. Kasbekar's opinions with respect to Easton's liability on the grounds that the plaintiff did not timely disclose Dr. Kasbekar's opinions as to Easton.  The Court then set a Daubert hearing with

respect to Dr. Kasbekar's qualifications and opinions, but only as to those opinions regarding the liability of defendant Bike Zoo.

The Daubert hearing was initially scheduled for January 23, 2006. [Doc. 158]. In a telephone conference with the Court on January 12, 2006, plaintiff's counsel advised that both of his experts, Dr. Kasbekar and James Green, may not be available to testify on the scheduled hearing date due to trials to which they were subpoenaed in other jurisdictions. A status hearing was scheduled for January 19, 2006, at which time plaintiff's counsel confirmed that neither expert would be available on January 23, 2006. The parties were instructed to contact the Court the following week with a new date for the hearing. [Doc. 170]. On February 1, 2006, the Daubert hearing was scheduled for March 17, 2006. Shortly thereafter, however, the Court attempted to reschedule the hearing for an earlier date in February. Plaintiff's counsel advised the Court that neither Dr. Kasbekar or Green were available for any date in February. The Daubert hearing was eventually reset to February 23, 2006. After a full day of testimony, the hearing was continued to March 1, 2006. At that time, plaintiff offered the depositions of Dr. Kasbekar and Mr. Green in lieu of their live testimony.

Dr. Kasbekar is president of Visual Sciences and does consulting work with Research Engineers, Incorporated. [Kasbekar Dep. at 5]. He is also an Adjunct Assistant Professor in the Department of Mechanical Engineering and Materials Science at The Duke University School of Engineering. He has expertise in the field of mechanical engineering and materials science, including the failure analysis of polymers and composite materials. He has performed research in the development of non-destructive materials characterization techniques which can be used to analyze defects in both metals and polymers at sub-microscopic levels. [Kasbekar Aff. at ¶ 1].

19

In his affidavit, Dr. Kasbekar opines that "the reported variances in the diameter of Easton handlebars, along with the improperly tightened connection between the stem and handlebar (as evidenced by the reported non-uniformly and undertorqued bolts as well as the non-uniform gap), are probable causes of the handlebar fracture in this case." [Kasbekar Aff. at ¶ 8]. In support of this opinion, Dr. Kasbekar states in his affidavit, in pertinent part[2], as follows:

> 2.    I have reviewed the results of the work performed by John Fellers, Ph.D. and Michael E. Stevenson, P.E.. [sic] Also, I have read the report created by James M. Green, P.E.

> 3.    Based upon the above stated material, my opinion is consistent with that of Mr. Green, in that the final failure of the handlebar was generally from a downward and forward direction of loading. Such evidence is consistent with the damage to the subject handle bar and with Greg Quillin's weight coming down on the handlebar, which took pace during normal use of the bicycle.

> *       *       *

> 7.    . . .Based upon [Dr. Fellers'] measurements the bolts securing the handlebar to the stem may have been under torqued by as much as 35 to 52 percent, and perhaps more significantly the measurements indicate an uneven torque. Such mechanical connection between the handlebar and stem can loosen if under torqued and non-uniformly torqued. Furthermore, inadequate and uneven torque will result in an uneven and increased gap between the top and bottom portions of the Thomson stem. These conditions are consistent with the measurements made by Dr. Fellers. The inadequate connection of the handlebar to the stem causes an additional change in the loading conditions intended for the handlebar, which can contribute to increased localized loading and an unexpected failure of the handlebar." [Id. at ¶ 7].

_____

[2]Dr. Kasbekar asserts several other opinions in this affidavit; however, those opinions relate to solely to Easton, and the Court has already ruled that Dr. Kasbekar is precluded from testifying as to any of these opinions.

[Id. at ¶¶ 2, 3, 7]. In his deposition taken on December 14, 2005, Dr. Kasbekar testified that, in addition to reviewing the reports and documents relied upon by the other experts, he also based his opinions on his visual and microscopic examination of the handlebar and stem. [Kasbekar Dep. at 31, 51]. Additionally, he measured the stem gaps and reviewed numerous Easton documents, including the installation instructions for the stem. [Id. at 12, 23].

With respect to his opinion regarding the manner in which the handlebar broke, Dr. Kasbekar stated in his deposition that he based his opinion on his review of numerous studies regarding the forces of a normal rider's weight under normal use on bicycle parts, particularly handlebars, as well as his previous experience with finite element analyses of handlebars and other bicycle components. [Id. at 52].

Dr. Kasbekar explained the basis for his opinion regarding the inadequacy of the connection between the stem and handlebar at installation as follows:

> Q.     In your affidavit, Dr. Kasbekar, on what specifically do you base your opinion that the torque was inadequate?
>
> *          *          *
>
> A.     I don't know that I have specifically said in here that the torque is inadequate but what I've said is that if it's torqued improperly it can increase the likelihood of failure.
>
> Let me also answer it by saying the fact that we've got two bolts that are showing up with lesser torques and different torques, and one of them which is on the left side away from the fracture, which is the lowest torque, is evidenced [sic] that the torque was much, most probably lower than 48 inch-pounds. So I'm basing it on Thomson's recommended torque as well as the values that were measured as well as the unevenness in the gap.
>
> Q.     Is there any way you can determine how much less the torque on the stem bolts was at the time of installation [than] the 48 inch-pounds?

> A. One thing I would like to do is get hold of Dr. Stevenson's broken stems that he tested and I would like to see those torque values tested after the test, assuming that we compare them to the measurements that were taken before the tests. That may be one way to do it. Without doing it, and maybe doing it several times, I can't answer that question.

[Id. at 133-34].

Bike Zoo argues that Dr. Kasbekar's opinions are not admissible because he indicates that the alleged under-torqued stem bolts was one of the *probable* causes of the handlebar fracture in this case. Bike Zoo argues that such an opinion does not rise to the proper standard for establishing causation. Further, Bike Zoo argues that Dr. Kasbekar's testimony is unreliable because it is not based on sufficient facts or data as he has improperly assumed that the torque measurements taken two years after installation and after an accident were the same as the torque applied by Bike Zoo at the time of installation.

In support of its contention that Dr. Kasbekar's opinion regarding "probable" cause does not rise to the proper standard for establishing causation, Bike Zoo cites Kalamazoo River Study Group v. Rockwell Int'l Corp., 171 F.3d 1065 (6th Cir. 1999). In that case, the plaintiff ("KRSG") relied upon the affidavit of an expert to show that the defendant Benteler had discharged certain pollutants known as PCBs into a ditch that flowed into a waterway. The district court found that KRSG had "created, at most, a question of fact as to whether or not there was a *possibility* that water flowed all the way down the ditch" to the affected waterway, but found that the expert's opinion was "based solely on speculation and possibility." Id. at 1072. The district court held that "[t]he existence of a possibility does not create a material issue of fact for trial because KRSG bears the burden of proof to show that Benteler did contribute to PCBs in the Kalamazoo River, not that

22

it is possible that it might have contributed to the PCBs." Id.  The Sixth Circuit affirmed, finding that the expert's opinion was not based on scientific evidence sufficient to allow a jury to find that it is more probable than not that Benteler caused PCB contamination of the waterway.  Id. at 1072-73.

The Court finds Kalamazoo River Study Group to be distinguishable from the instant case.  Dr. Kasbekar's rests on more than mere "speculation or possibility";  his opinion is based upon his visual and microscopic examination of the handlebar and stem, as well as his review of various studies and documents, including the reports of Dr. Fellers and Dr. Stevenson.  The fact that Dr. Kasbekar has identified the inadequate stem connection as only one of the probable causes of the handlebar failure in this case does not render his opinion inadmissible.  "In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury."  Jahn v. Equine Services, PSC, 233 F.3d 382, 390 (6th Cir. 2000).  "The fact that several possible causes might remain 'unelimimated' . . . only goes to the accuracy of the conclusion, not to the soundness of the methodology."  Id.

With respect to Bike Zoo's argument that Dr. Kasbekar's testimony is unreliable because he has relied upon the torque measurements taken by Dr. Fellers two years after installation, the Court has already rejected this argument in addressing the motion seeking to exclude Dr. Stevenson [see Doc. 206], and thus, the Court need not address this issue further.

For the foregoing reasons, Bike Zoo's Motion to Exclude Certain Testimony of Proffered Expert Witness, Anand D. Kasbekar [Doc. 117] is **DENIED**.

## V.    JAMES GREEN

Easton moves to exclude the testimony of plaintiff's proffered expert witness James M. Green, P.E.  For grounds, Easton argues that there is absolutely no evidence presented to the Court that Mr. Green is qualified to render expert opinions in this case.  Easton contends that Mr. Green's affidavit is silent as to his qualifications, and the plaintiff has not provided his curriculum vitae, list of publications, compensation information, and/or a listing of other cases in which Mr. Green has testified.  [Doc. 113].

The plaintiff argues that Dr. Green's report was provided with the plaintiff's initial disclosures, which were served on May 19, 2004.  That report includes a reference to Mr. Green's website, www.bikereconstruction.com, where Mr. Green's C.V. and a list of prior cases in which he has testified can be found.  Regardless, the plaintiff argues, all information required by Rule 26 has now been provided to the defendants. [Doc. 119].

In its reply [Doc. 123], Easton argues that the plaintiff did not provide Mr. Green's C.V. or his disclosure of fees until October 26, 2005, well over a month past the expert disclosure deadline and after Easton's motion to exclude Mr. Green had been filed.  Additionally, Easton argues (1) that Mr. Green is not qualified by education, experience or training to render expert opinions as to a manufacturing or design defect or as to causation of the handlebar fracture and (2) that Mr. Green's opinions are not based upon scientific principles or methodology.

Mr. Green was deposed on January 16, 2006.  Thereafter, Easton filed a motion [Doc. 199], seeking to supplement its motion to exclude Mr. Green's testimony.  For good cause shown, Easton's Motion to Supplement [Doc. 199] is **GRANTED**.  In the supplement to its motion, Easton submits additional grounds for the exclusion of Mr. Green's testimony.  First, Easton argues that Mr.

24

Green has not done any testing or analysis sufficient to render admissible expert opinions in this case. Second, Easton argues that Mr. Green has never prepared or submitted a report in compliance with Rule 26(a)(2) of the Federal Rules of Civil Procedure.

In his report dated October 18, 2002, Mr. Green states the following conclusions:

1. The failure of the subject handlebars occurred from the normal weight of the cyclist on the handlebars from normal riding. From my inspection of the past riding habits of this cyclist, I can find no evidence of misuse of this bike or handlebar.

2. The failure mode appears to be a simultaneous collapse of the carbon fibers. The bottom fibers appear to have failed by compressing. The upper fibers appear to have failed by elongating past their yield strength.

3. The micro inspection of the handlebars indicate that the failure was instantaneous thus giving the cyclist no time to react to the failure.

The subject Easton CT2 handlebar failed under normal foreseeable use. The failure was sudden and well outside the ability of the cyclist to react to the failure. The failure of this handlebar, based on the data generated thus far, is the direct result of the substandard manufacture of the Easton CT2 handlebar.

Mr. Green concludes his report with the following caveat:

It should be noted that, as of the date of the Engineering seal on this report [October 10, 2002], no destructive testing has been done on the Easton CT2 handlebar. A representative from the manufacturer of the Easton handlebar has a right to be present for any such testing. Until such additional testing is preformed [sic], *this is a preliminary engineering report.*

[Green Oct. 18, 2002 Report at 2] (Emphasis added).

For the reasons that follow, Easton's Motion to Exclude Testimony of Proffered Expert Witness James M. Green [Doc. 113] is **GRANTED**.

## A.      Timeliness of Disclosure

The plaintiff provided a copy of Mr. Green's October 18, 2002 report with the plaintiff's initial disclosures, which were served on the defendants on May 19, 2004.  The Court finds that Mr. Green's October 18, 2002 report does not satisfy the requirements of Rule 26(a)(2). First, the report does not "contain a complete statement of all opinions to be expressed and the basis and reasons therefor."  See Fed. R. Civ. P. 26(a)(2).  Mr. Green candidly admitted in his deposition that this report was not a report within the meaning of Rule 26(a)(2):

> Q.      Were you asked to prepare a 26(a)(2) report in this case?
>
> A.      No.
>
> Q.      Have you ever to date been asked to prepare a 26(a)(2) disclosure in this case?
>
> A.      Not in this case, no.  I've certainly done them, more than I would want to.
>
> Q.      Would you agree with me that the report we have marked as Exhibit 2 is not a 26(a)(2)-compliant report?
>
> A.      No.  Good Lord, no.  That is a preliminary report, just like it says.

[Green Dep. at 81].

Even if Mr. Green's report could be considered a "complete statement of [his] opinions to be expressed and the basis and reasons therefor," it does not include any information regarding "the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; [or] a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years," see Fed. R. Civ. P. 26(a)(2), nor was such information provided

prior to the expiration of the expert disclosure deadline of September 26, 2005. While the plaintiff argues that the defendants could have discovered the missing information by visiting Mr. Green's website, the Court does not find that the mere inclusion of a website address in the heading of a report, without any indication that the missing information could be located there, to be sufficient to satisfy plaintiff's Rule 26(a)(2) obligations.

### B. Qualifications

Mr. Green is a forensic engineer with a professed speciality in reconstructing bicycle accidents, pedestrian accidents, and those accidents where visibility or conspicuity is an issue. [Green Dep. at 4]. According to his C.V., Mr. Green holds a B.S. degree in physical science and M.S. degrees in environmental and occupational health and civil engineering. He is president of GE Engineering, Inc., a forensic engineering firm that specializes general accident reconstruction of incidents involving bicycles, pedestrians, and various motor vehicles. The emphasis in these reconstructions has been on the movement of the various entities and the reaction times available to the operators under the available lighting conditions. Mr. Green is a Fellow of the American Society of Civil Engineers and the National Academy of Forensic Engineers and is a member of the Professional Engineers of North Carolina, the National Society of Professional Engineers, the Professional Engineers in Private Practice, and the Institute of Transportation Engineers. [Green C.V. at 1-2]. He has written numerous publications on bicycle accident reconstruction. [Id. at 4-6].

In his deposition, Mr. Green stated that he has taken design courses regarding the applicability of road signation. He has no experience or training in the design of bicycle components. [Green Dep. at 8].

Mr. Green further testified that for about twenty years, his engineering firm constructed and optimized bicycles for high performance and racing. Mr. Green stated that he had a small lab in which he built bicycles and tested products. He and his firm stopped building bicycles around 2001. Mr. Green, however, continues to do some product testing in Dr. Kasbekar's laboratory. [Id. at 14]. Mr. Green's current work focuses on two areas: failure analysis of bicycle components, including carbon fiber components, and accident reconstruction. He admitted that failure analysis is a "very small percentage" of his work. [Id. at 15-16]. Mr. Green further explained as follows:

> A. Where I get called in, usually by other engineering firms, is to determine how the product failed, because of the testing that we've done. When I say "how" it failed, I mean to say the method in which the failure occurred. Which direction did it break? Which direction did it fail? And the reason other engineers tend to call me on that is because I've done a lot of testing in the lab. I'll set up an exemplar bike on a – on a test track and put weight around it and beat it to death and break it up and that sort of thing. And so usually when I get called in, it is not whether – regarding the material, per se, but how – the mode of failure, how did it simply fail to begin with. That is usually what other engineers use me for.

> Q. So not the failure of the material, but the mode of the failure of the component?

> A. Well, the mode of the failure of the material or the component, which way did it break, that kind of thing. I don't get work, nor am I really qualified in, the metallurgical end of it. That is where I usually associate with someone like Dr. Kasbekar.

> Q. So you don't look for a defect in the material, per se, but you look at the mode of the failure?

> A. Yes, exactly.

[Id. at 17-19].

28

The Court agrees with Easton that the record does not establish that Mr. Green has the requisite "knowledge, skill, experience, training, or education" to testify regarding a manufacturing or design defect in the subject handlebar. While Mr. Green has extensive experience in the areas of accident reconstruction and analysis of the mode of failure of bicycle components (*i.e.*, determining the direction in which something broke or failed), he has not demonstrated the requisite familiarity with the design and/or manufacture of such components, or with the areas of materials science, carbon composites, or mechanical engineering. Accordingly, to the extent that Mr. Green seeks to offer any opinion that the failure of the handlebar resulted from a manufacturing or design defect in the subject handlebar, his testimony shall be excluded.

## C.    Reliable Principles and Methodology

In his deposition, Mr. Green repeatedly emphasized that the opinions stated in his report, as well as any opinions expressed in his deposition, were merely preliminary because he had not performed the testing required to render any final opinions:

> A.    . . . I'm saying that these are preliminary conclusions, emphasis on the word preliminary, because I take that very serious, when I say preliminary. My initial analysis in 2002 I give here. But I – as I say in the last paragraph, "Until such additional testing is performed, this is a preliminary engineering report."

[Id. at 61-62].

> Q.    Is there a reason that you didn't do any [testing] in this case?
>
> A.    Well, back in 2002, I submitted an engineering report and that is the last I heard of this project until it reared its head at the end of 2005.
>
> Q.    So you didn't do any of that testing prior to preparing your engineering report that we've marked as Exhibit 2?
>
> A.    Correct. I did not.

Q.      You haven't done any testing since you prepared your engineering report?

A.      That is correct.

[Id. at 49].

Q.      Could you say how it contributed to the failure, this condition that you're describing?

A.      Well, no, because we need to – we need to do the testing, and I'm very uncomfortable putting my seal on an engineering report when I don't have the numbers to back it up, and that is why I recommended that additional work be done in 2002.  I don't know any other way I could state it, other than that is simply how it is done.

[Id. at 71].

Q.      When my office first started trying to schedule your deposition in this case, we were told that you didn't want to give us any deposition dates until Dr. Kasbekar had performed some additional testing and you got the results of that testing?

A.      Sure.

Q.      What testing were you referring to, and why didn't you want to give your deposition until then?

A.      We had made recommendations back in 2002 for additional work to be done and I submitted a preliminary report, and until I understood exactly what data had – was out there and exactly what testing was left to be done, I wasn't going to sit in a room with you guys, because I – I wanted to read – I just read Fellers and the other engineer here in the last few months.

Q.      You're giving your deposition and sitting in the room with us today.  Has that been done?

A.      Well, no additional testing has been done, and I'm – I'm giving you my opinion with a lot of qualifiers, here.

Q.      What are those qualifiers?

30

A.      Well, we can go back through them, but I'm going to say, one, we – we requested some additional testing be done back in 2002.

Q.      That was never done?

A.      That has not been done . . . .

                              *       *       *

A.      All I know is, **I'm not going to give a final opinion until I'm comfortable with the data.**  That is all I care about.

Q.      So the opinions you're giving me today are also preliminary opinions?

A.      **They're still preliminary, because we've asked for additional work to be done.**

[Id. at 93-94] (emphasis added).  Mr. Green further testified that he had not been asked to do any additional work on this case. [Id. at 82].  When asked what prevented this additional testing from being done between 2002 and 2005, Mr. Green stated that he had "no idea." [Id. at 97].

By his own admission, Mr. Green's opinions are not based upon sufficient facts or data because he has not had done the testing that, in his view, is required before he can render any final opinion in this case.  Without this additional testing, Mr. Green's testimony is admittedly lacking a reliable scientific basis.  Accordingly, the Court finds that Mr. Green should be precluded from testifying in this case.

## VI.    EASTON'S MOTION FOR PROTECTIVE ORDER

Easton asks the Court to enter a protective order so that Easton will not be required to respond to Plaintiff's Second Set of Interrogatories and Third Request for Production of Documents to Easton, which were served on January 17, 2006. [Doc. 190].

The discovery deadline in this case was originally October 26, 2005 (90 days before the January 24, 2006 trial date). In an Order entered on December 28, 2005, the Court granted the plaintiff's motion for a continuance of the trial date and extended the discovery deadline for 30 days for the sole purpose of allowing the plaintiff "to depose Easton witnesses about the alleged newly discovered evidence." [Doc. 158]. The Court did not extend the discovery deadline with respect to written discovery, and therefore, the Plaintiff's Second Set of Interrogatories and Third Request for Production of Documents are untimely. Accordingly, Easton's Motion for Protective Order [Doc. 190] is **GRANTED**.

## VII.    PLAINTIFF'S MOTION TO ADOPT DR. STEVENSON'S TESTIMONY

The plaintiff moves to adopt the testimony of Dr. Michael Stevenson as part of his case-in-chief. [Doc. 148]. Bike Zoo opposes the plaintiff's motion, arguing that plaintiff's identification of Dr. Stevenson as an expert is not timely. Bike Zoo further argues that the plaintiff is barred by the doctrine of judicial estoppel from using Dr. Stevenson as an expert witness.

For good cause shown, Plaintiff's Motion to Adopt Testimony of Dr. Michael E. Stevenson [Doc. 148] is **GRANTED**. The Court finds that the plaintiff's untimely adoption of this testimony is harmless in light of the fact that Dr. Stevenson was already fully and timely disclosed as an expert by Easton. Furthermore, the Court does not find that the doctrine of judicial estoppel

bars the plaintiff from adopting the testimony of two experts with competing theories regarding the liability of two defendants. "The doctrine of judicial estoppel applies only where there has been a willful misstatement of fact – that is, perjury." <u>Woods v. Woods</u>, 638 S.W.2d 403, 406 (Tenn. Ct. App. 1982). The doctrine does not apply where the party can show that the previous allegedly contradictory statement was anything short of a willfully made misstatement of fact. <u>Id.</u> The Court cannot say that the plaintiff's adoption of Dr. Stevenson's testimony constitutes a willful misstatement of fact. Accordingly, the Court finds the doctrine of judicial estoppel to be inapplicable in this case.

## VIII. CONCLUSION

For the reasons set forth herein, Easton's Motion to Exclude Testimony of Proffered Expert Witness John E. Fellers [Doc. 111] is **GRANTED IN PART** and **DENIED IN PART;** Bike Zoo's Motion to Exclude Certain Testimony of Proffered Expert Witness, Anand D. Kasbekar [Doc. 117] is **DENIED**; Easton's Motion to Supplement Easton Sports, Inc.'s Motion to Exclude Testimony of Proffered Expert Witness James M. Green [Doc. 199] is **GRANTED**; Easton's Motion to Exclude Testimony of Proffered Expert Witness James M. Green [Doc. 113] is **GRANTED**; Easton's Motion for Protective Order [Doc. 190] is **GRANTED**; and Plaintiff's Motion to Adopt Testimony of Dr. Michael E. Stevenson [Doc. 148] is **GRANTED**.

IT IS SO ORDERED.

ENTER:


　　s/ C. Clifford Shirley, Jr.　　
United States Magistrate Judge